**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**JOHN QUILES and JEANNETTE QUILES,**
**Individually and as Mother and Natural Guardian**
**for J.L.Q.,  a minor, J.A.Q., a minor, and**
**MICHAEL J. BALANOFF, as Trustee in Bankruptcy**
**of Johnny Quiles a/k/a John Quiles,**

                                            **Plaintiffs,**

          **V.**                                                           **10-CV-747**


**BRADFORD-WHITE CORPORATION,** *et al.,*

                                            **Defendants.**

_____

**THOMAS J. McAVOY,**
**Senior United States District Judge**


                                   **DECISION & ORDER**

**I.      INTRODUCTION**

          Plaintiffs commenced this diversity action asserting claims of negligence and strict

products liability after a fire erupted at the Quiles residence injuring members of their

family. See Compl. dkt. # 1.  Presently before the Court is Defendant Bradford-White

Corporation's motion for summary judgment. Dkt. # 73.  Plaintiffs have opposed the

motion and Bradford-White Corporation has filed reply papers.  The Court will decide the

motion based upon the parties' submissions, all of which have been considered.

## II.   STANDARD OF REVIEW

On a motion for summary judgment the Court must construe the properly disputed facts in the light most favorable to the non-moving party, see Scott v. Harris, 127 S. Ct. 1769, 1776 (2007), and may grant summary judgment only where "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  That is, "[s]ummary judgment is appropriate only if, after drawing all permissible factual inferences in favor of the non-moving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." O'Hara v. National Union Fire Ins. Co. of Pittsburgh, PA, 642 F.3d 110, 116 (2d Cir. 2011)(citing Anemone v. Metro. Transp. Auth., 629 F.3d 97, 113 (2d Cir. 2011)).

## III.   BACKGROUND

Plaintiffs John and Jeanette Quiles are husband and wife who reside in Apalachin, New York with their two minor sons, J.L.Q. and J.A.Q.. Compl. ¶ 1.  Plaintiffs contend that in the evening of June 28, 2007, Jeanette Quiles and her 14 year old son J.L. went to the basement of their home to investigate the smell of gasoline vapors which seemed to be coming from the attached garage adjacent to the basement area.  Id. ¶ 30.  When Jeanette Quiles opened the basement  door leading to garage, a sudden violent explosion, flash over and fire occurred.  Id.  Jeanette Quiles, J.L., and John Quiles, who was also in the basement, sustained serious burns. Id. ¶ 36.  J.A. was injured to a lesser degree.  Id. ¶ 37.

Plaintiffs theorize that combustible vapors emanating from gasoline that leaked from a lawn tractor in the garage traveled along the floor to a water heater located in a

utility room behind the doorway to the garage where it was ignited by the water heater's

pilot light.  Plaintiffs assert that "the subject water heater was defectively designed and

manufactured and unreasonably dangerous and failed to warn of said dangers associated

with the location of the gas fired pilot light in its proximity close to the ground without a

flame arrestor, where volatile flammable fuel vapors often congregate." Compl. ¶ 32.

Plaintiffs further assert that "[a]lternative safer designs with flame arrestors, elevated pilot

lights, sealed combustion areas that draw air from a location outside the room isolating the

pilot light flame from expected external combustible vapors have been available since the

early 1970s, long before the subject water heater was sold to the Quiles." Id. ¶ 34.

Plaintiffs also assert:

41. Defendant had a duty of care to provide a safe and working hot water heater to the Quiles and other consumers who purchased its product.

42. The risk of an explosion, flash over and fire was well known by defendant and others in the industry and was a foreseeable and unreasonable risk to home owners. The failure to have a flame arrestor and/or a flame elevated at least 18 inches off the ground and/or a sealed combustion area to draw air from a safe location was careless, negligent and reckless and displayed wanton disregard for consumers and homeowners, including plaintiffs.

43. As a direct and proximate cause of defendant's negligence, defective design, manufacture, instructions and warnings, the subject water heater ignited the basement of the Quiles' home in a ball of fire seriously injuring all four Quiles plaintiffs.

Compl. ¶¶ 41-43.

Except where indicated otherwise, the following facts are admitted by Plaintiffs in

response to Defendant Bradford-White Corporation (BWC)'s Statement of Material Facts.

The subject water heater is a gas-fired water heater with model number MI403S6CX12

and serial number TF5994210.  It is designed for residential use, is atmospherically

vented, and has a 40-gallon capacity.  The water heater was manufactured in June 1999

by BWC and was design certified by the American Gas Association Laboratories.  The

water heater was built in compliance with ANSI Z21.10.1c-1996, which was the governing

American National Standards Institute ("ANSI") standard at the time of the manufacturing

of the subject water heater and at the time the water heater left BWC's control.  Plaintiff

contends, however, that BWC was advised by the Consumer Products Safety Commission

that the ANSI standard was going to be changed in order to prevent pilot light ignition of

external flammable vapors prior to 1999, and was in fact changed in 2003.

The water heater contained graphic and textual warnings as depicted in the

photographs contained in Attached 1 to this Decision and Order.  The text and graphic

markings on the rating plate of the subject water heater are generally consistent with the

design drawings concerning the model of the subject water heater, as represented by the

excerpt contained in Attachment 2 to this Decision and Order.

Warnings in the instructions for the subject water heater model commence with:

WARNING:  If the information in these instructions are not followed exactly, a fire or explosion may result causing property damage, personal injury or death.

⇒  Do not store or use gasoline or other flammable vapors, liquids or materials in the vicinity of this or any other appliance.

The maintenance portion of the instructions for the subject water heater states:

8.  At all times the appliance area must be kept clear and free from combustible materials, gasoline and other flammable vapors and liquids.

A safety warning in the instructions for the subject water heater states:

**SAFETY WARNING**

1. Water heaters are heat producing appliances and to avoid damage or injury in the event of possible overheating of the outer jacket (1) no materials should be stored against the jacket and (2) care should be taken to avoid unnecessary contact (especially by children) with the jacket.  UNDER NO CIRCUMSTANCES SHOULD FLAMMABLE MATERIALS, SUCH AS GASOLINE OR PAINT THINNER, BE USED OR STORED IN THE VICINITY OF THE HEATER OR IN ANY LOCATION FROM WHICH FUMES COULD REACH THE HEATER.

Plaintiffs assert that the warnings in the printed instructions are "vague as to 'vicinity' and do[] not warn about storing liquids in the garage that is two rooms away."  Pl. Resp. to Def's Stat. Mat. Facts.

## IV.    DISCUSSION

### a.    Applicable Law

The parties correctly agree that New York substantive law applies to all claims in this case.  See Gasperini v. Center for Humanities, Inc., 518 U.S. 415, 427, 116 S. Ct. 2211, 135 L. Ed.2d 659 (1996); Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496, 61 S. Ct. 1020, 85 L. Ed. 1477 (1941); Dalton v. Stedman Machine Co., 2008 WL 351676, at * 1 (N.D.N.Y. Feb. 7, 2008).  Under any theory of New York product liability law - strict products liability or negligence - a "plaintiff must present evidence of a product defect to prevail."  Pinello v. Andreas Stihl AG & Co., 2011 WL 1302223, at *10 (N.D.N.Y. 2011). "A product may be defective when it contains a manufacturing flaw, is defectively designed or is not accompanied by adequate warnings for the use of the product . . . ."  Speller v. Sears, Roebuck and Co., 100 N.Y.2d 38, 41 (2003); McCarthy v. Olin Corp., 119 F.3d 148, 155-56 (2d Cir.1997)("In New York, there are three distinct claims for strict products liability: (1) a manufacturing defect, which results when a mistake in manufacturing renders a product that is ordinarily safe dangerous so that it causes harm; (2) a warning defect, which occurs when the inadequacy or failure to warn of a reasonably foreseeable

5

risk accompanying a product causes harm; and (3) a design defect, which results when the product as designed is unreasonably dangerous for its intended use.") (internal citations omitted).

BWC argues that pursuant to Fed. R. Evid. 702, Plaintiffs' experts cannot offer admissible opinions as to critical elements of each claim, and, therefore, the claims must be dismissed.  In the alternative, BWC seeks a hearing pursuant to  Fed. R. Evid. 702, 104(a), and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579(1993),  to determine whether either of Plaintiffs' experts can offer admissible testimony in support of Plaintiffs' claims.

"If a proffer of expert testimony is excluded as inadmissible pursuant to Rule 702, the court must make the summary judgment determination on a record that does not include that evidence." Colon v. Molina, 199 F. Supp. 2d 53, 68 (S.D.N.Y. 2001). Where an expert's opinion is needed on an essential element of a products liability case, and that essential expert opinion is precluded, "plaintiff's theories are no longer viable and summary judgment is appropriate." Pinello, 2011 WL 1302223, at *10.

> **b.**     **Court's Gatekeeping Function**

Rule 702 of the Federal Rules of Evidence provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702 ("Rule 702").

In <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993), the United States Supreme Court explained that the Federal Rules of Evidence are satisfied and expert evidence admissible where "the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." <u>Id.</u> at 592-93.  District Courts have a "gatekeeping" role under Federal Rule of Evidence 702 and are charged with "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  <u>Amorgianos v. Nat'l R.R. Passenger Corp.</u>, 303 F.3d 256, 265 (2d Cir. 2002) (quoting <u>Daubert</u>, 509 U.S. at 597). The Court must determine "whether the proffered testimony has a sufficiently reliable foundation to permit it to be considered."  <u>Amorgianos</u>, 303 F.3d at 265 (internal quotation marks omitted).  This inquiry involves considering whether (1) the testimony is grounded on sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has applied the principles and methods reliably to the facts of the case. Fed. R. Evid. 702.  The inquiry is fluid and will vary from case to case.

In assessing whether the expert's knowledge is based upon "scientific" or technical principles and methodology that will assist the trier of fact, the Court's "focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." <u>Daubert</u>, 509 U.S. at 595.  Accordingly, "gaps or inconsistencies" in an expert's reasoning, or arguments that an expert's conclusions are wrong, "go to the weight of the evidence, not to its admissibility."  <u>Campbell v. Metropolitan Property and Cas. Ins. Co.</u>, 239 F.3d 179, 186 (2d Cir. 2001).  Likewise, disputes regarding the nature and strength of an expert's credentials, an expert's use or application of his methodology, or the existence or number of supporting authorities for an expert's opinion, go to the weight, not the

admissibility of his testimony. McCullock v. H.B. Fuller Co., 61 F.3d 1038, 1044 (2d Cir. 1995).  As the Supreme Court has noted, "[v]igorous cross-examination, presentation of contrary evidence and careful instruction on the burden of proof are the traditional and appropriate means of attacking an expert who has applied a valid methodology in reaching his or her opinions."  Daubert, 509 U.S. at 596.

### c.   Manufacturing Defect

Plaintiffs have withdrawn any claim for a manufacturing defect in the subject heater. See Pl. MOL in Opp., p. 15. Therefore, the motion in this regard is granted and all manufacturing defect claims against BWC are dismissed.

### d.   Design Defect

Plaintiffs assert that the subject water heater was defectively designed in that it did not have a flame arrestor on the pilot light, an elevated pilot light, or a sealed combustion area that could draw air from a location outside the room isolating the pilot light flame from expected external combustible vapors.  BWC argues that Plaintiffs' design defect claims must be dismissed because Plaintiffs do not have an expert qualified to offer an opinion as to the feasability of alternative designs incorporating the design modifications proffered by Plaintiffs.

"In order to establish a *prima facie* case in strict products liability for design defects, the plaintiff must show that the manufacturer breached its duty to market safe products when it marketed a product designed so that it was not reasonably safe and that the defective design was a substantial factor in causing plaintiff's injury." Voss v. Black & Decker Mfg. Co., 59 N.Y.2d 102, 107 (1983).  Thus, to prevail on a design defect claim, a

plaintiff "must demonstrate that (1) the product as designed posed a substantial likelihood of harm; (2) it was feasible to design the product in a safer manner; and (3) the defective design was a substantial factor in causing plaintiff's injury." Galletta v. Valmet, Inc., 2007 WL 963288 at * 4 (N.D.N.Y. March 30, 2007)(Mordue, C.J.)(quotations marks and citations omitted); see Robinson v. Reed-Prentice Div. of Package Mach. Co., 49 N.Y.2d 471, 479 (1980)( "[A] defectively designed product is one which, at the time it leaves the seller's hands, is in a condition not reasonably contemplated by the ultimate consumer and is unreasonably dangerous for its intended use; that is one whose utility does not outweigh the danger inherent in its introduction into the stream of commerce.").

Whether a product is unreasonably dangerous generally is a question of fact depending on such issues as the potential for alternative designs, the costs of alternative designs, and the product's usefulness as designed. Urena v. Biro Mfg. Co., 114 F.3d 359, 364 (2d Cir. 1997)(citing Voss, 59 N.Y.2d at 107). The showing of a feasible, alternative design is a *sine qua non* of a design defect claim. Morritt v. Stryker Corp., 2011 WL 3876960, at * 6 (E.D.N.Y. Sept. 1, 2011)(citing Voss, 59 N.Y.2d at 107). "The plaintiff, of course, is under an obligation to present evidence that the product, as designed, was not reasonably safe because there was a substantial likelihood of harm and it was feasible to design the product in a safer manner." Voss, 59 N.Y.2d at  108.  "[U]nder New York law, a plaintiff seeking to establish a design defect is required to provide expert testimony as to the feasibility and efficacy of alternative designs. The only exception to this rule is if a reasonable alternative design is both obvious to and understandable by a layperson." Soliman v. Daimler, AG, 2011 WL 6945707, at *5 (E.D.N.Y. Aug. 8, 2011) (citations and internal quotation marks omitted).

9

> Proof of a safer alternative design can consist either of (1) an expert demonstrating, through testing and construction of a prototype, that an alternative is feasible, practical, economical, and safe; or (2) an expert identifying manufactures of similar equipment that have put the proposed design into use. Rypkema v. Time Mfg. Co., 263 F. Supp.2d 687, 692 (S.D.N.Y.2003).  Despite this standard, there is no specific evidence a plaintiff must submit, although "unsupported, conclusory evidence on the technological and economic feasibility of a safer design is insufficient." Ferracane v. United States, No. 02–CV–1037, 2007 WL 316570, at *5 (E.D.N.Y. Jan. 30, 2007) (quoting G.E. Capital Corp. v. A.O. Smith Corp., No. 01 Civ. 1849, 2003 WL 21498901, at *4 (S.D.N.Y. July 1, 2003) (internal quotations omitted).

Mathis-Kay v. McNeilus Truck & Mfg., Inc., 2011 WL 4498386, at *7 (W.D.N.Y. Sept. 27, 2011).

### 1.    Plaintiffs' Expert Reports

Plaintiffs proffer two experts, Stuart Morrison and Jason Mardirosian.  Plaintiffs assert that "[b]oth Mardirosian and Morrison have investigated the cause and origin of thousands of fires, including other water heaters, and have also been qualified to provide testimony on how fires could and should have been avoided with regard to components involved in starting fires."  Pl. MOL pp.  2-3; see Pl. Joint Opp. To Defs. 702 Motion to Exclude Expert Test., p. 2.[1]  However, neither expert report sets forth any analysis about

---

[1]Plaintiffs assert:

Plaintiffs' experts Stuart Morrison, PE and Jason Mardirosian are well qualified fire cause and origin investigators who were retained by plaintiffs to determine what caused the fire in the Quiles home causing serious thermal injuries to the Quiles family on the night of June 28, 2007.  Both experts have investigated thousands of fires to determine how and why they started and how they could have been prevented.  PSF  1, 2, 9.

Both experts followed common investigative practices in evaluating the fire scene in person and/or from photographs, inspecting the forensic evidence retrieved from the home after the fire and preserved, reviewing the Tioga County Fire Investigative report and photos, reading the deposition transcripts of all four Quiles family members and Tioga County Fire Investigator David Churchman and retired Fire Marshal Patrick McGinley, (who was retained by Sceptor Corporation, manufacturer of the 14 gallon fuel caddy).  Both of plaintiffs' experts narrowed the possible sources of fuel and sources for ignition based on burn patterns, post fire condition and location of various components and timing based on the sequence of

10

an alternative water heater design or discusses the feasibility of an alterative design.  See Report of Stuart S. Morrison, PE; Report of Jason Mardirosian, CFEI, CFI, dated 9/27/11. Moreover, neither expert report offers an opinion about whether the subject water heater was reasonably safe or defective as designed, and neither report engages in any risk-utility analysis of the water heater or an alternative design.

## A.  Jason Mardirosian

Mardirosian is currently an Investigating Fire Marshall with the Chicago Fire Department as well as a Field Instructor for Investigations at the University of Illinois and College of Dupage County.  He is a certified Fire Investigator whose typical duties include "origin and cause fire/explosion investigations, interview and interrogation, crime scene preservation, evidence collection, oral and written report generation, fire scene photography, and fire scene diagramming."  Curriculum Vitae of Jason Mardirosian. Mardirosian's experience and training, as well as his own explanation of his expertise, clearly show that he is a general cause and origin expert.  Mardirosian admitted in his deposition that he has no knowledge, skill, education or experience in water heater design, manufacturing or warnings.  See 1/19/12 Dep. of Mardirosian at 252:17 to 253:21.

With regard to Mardirosian's report, nowhere in his report does he mention that the subject water heater could have or should have had a flame arrestor.  Nor does his report

---

events.  Following NFPA and other fire investigation practices universally accepted by experts in the community, both experts were able to eliminate potential ignition sources and also identified direct evidence of cause from the water heater as the source of ignition and the lawn tractor as the source of the gasoline leak.  PSF  3, 4, 5, 6, 7, 8.

Both experts have extensive training and experience in not only determining the cause and origin of fires, but also on how they can be prevented.  PSF  9.

11

discuss the state of the art in flame arrestor technology in water heaters, either in 1999 or at any other time.  He also does not discuss an 18 inch height elevation requirement for the pilot light, nor does he mention an alternative design that would bring air into the water heater unit from above or from outside the home.  Without an opinion expressed in his report, the basis and reasons for those opinions, as well as the data or other information considered in reaching his opinions, Mardirosian may not provide opinion testimony as to the feasability of an alternative design of the subject water heater.  See Fed.R.Civ.P. 26(2)(B) (an expert must provide a complete statement of his opinions, and the basis and reasons for those opinions, as well as the data or other information considered in reaching his opinions).

### B.  Stuart Morrison

Morrison is a licensed Professional Engineer and a certified Fire Investigator. He is currently the President of an engineering firm that does consulting work, including origin and cause investigations.  See Curriculum Vitae of Stuart Morrison.  Morrison has never designed a water heater nor worked for a company that did.  See 1/24/12 Deposition of Morrison at 23:18-24:6.

Morrison's report is suggestive of an opinion concerning the design of the water heater but nowhere in the report does he identify any feasible alternative design of water heater that existed in 1999 that might have prevented the fire in the Quiles' home on June 28, 2007.  Rather, the entirety of Morrison's opinion concerning the design of the water heater is as follows:

> Inspection of the water heater revealed that it did not include a flame arrester.  The unit was reportedly installed in 1999, several years after the Consumer Safety Protection Service (CSPS) pressured the water heater

12

industry to form a consortium to address issues with ignition of flammable vapors by gas water heaters with standing pilot lights. As of 1999, it was reported that flame arresters on water heaters had evolved but were still in the process of debugging or ensuring proper operation and were not available for general use until approximately 2002, at which point they were required on all new units by the following year.

Flame arresters had been in use in other industries dating back to approximately 1815 when they were first developed for use on lanterns in coal mines to prevent explosions from ignition of flammable vapors in that area. Flame arrestor technology was readily available. The water heater industry was well aware of the dangers present. Had a flame arrester been installed on the water heater in the Quiles home, the fire and fire related injuries would not have occurred.

Morrison Report, at p. 7.

Nothing in these two paragraphs refers to an alternative design for water heaters at the time the subject water heater in this case was manufactured. The vaguely worded sentence that "[f]lame arrestor technology was readily available" is not supported by any data, testing, or analysis concerning water heaters. Moreover, Morrison testified at his deposition that he was not aware of any manufacturer that had a water heater with vapor resistant technology on the market in July 1999. See 1/24/12 Deposition of Morrison at 42:15-43:17. Further, like Mardirosian, Morrison also does not discuss in his report the requirement for, or feasability of, an 18 inch height elevation of the pilot light, nor mention an alternative design that would bring air into the water heater unit from above or from outside the home. In sum, Morrison does not put forth any expert opinion in his report on the existence of a feasible alternative design for the water heater.

## 2.  Additional Facts

Plaintiffs argue that their experts may rely on additional facts and outside evidence in reaching their opinions, and have expressed these opinions through their testimony

during their depositions.  As to outside evidence, Plaintiffs point to a competitor of BWC that used a flammable vapor ignition-resistant (FVIR) technology in its hot water heater in 1999, and cite to opinions from the Consumer Protection and Safety Commission before 1999 that recommended that flame arrestors be installed on all residential hot water heaters.  From this information, Plaintiffs argue that Morrison, a licensed engineer, can testify that flame arrestor technology on water heaters was feasible at the time the subject hot water heater was manufactured.

Plaintiffs also argue that they can provided admissible expert opinion supporting the proposition that the subject water heater was defectively designed because the pilot light was not located 18 inches off the ground.  In support of this proposition, Plaintiffs cite to BWC literature from 1999 that required its hot water heaters installed in garages, where flammable vapors are lightly to exist, to be placed on a base stand in order to elevate the pilot light above 18 inches from the floor.  In this regard, Plaintiffs assert:

> Stuart Morrison, a licensed engineer with a specialty in evaluating mechanical, electrical and other components in relation to fire cause and origin was later retained to evaluate the forensic evidence at two inspections of the home's contents that were preserved after the fire.  He also reviewed scene photos and took new photos of the forensic evidence.  PSF  4.[2]  Mr. Morrison read the testimony of the plaintiffs and the Tioga County Fire Investigator David Churchman and retired Philadelphia Fire Marshal Patrick McGinley.  In short, he used the same methodology as all of the fire experts in this case.  PSF  5-9.
>
> * * *
>
> He was familiar with the long history of residential and commercial water heater fires.  He was able to rule out the other possible ignition sources based on their location and condition post fire when tested against the timing sequence and other evidence in the record.  He was able to conclude the

---

[2]"PSF" cites are to Plaintiffs' Statement of Material Facts, a document separate from Plaintiffs' Response to Defendant BWC's Statement of Material Facts.

water heater ignited the heavy gasoline vapors coming from the garage.  He also concluded that if the pilot light was 18 inches off the floor level, it is highly unlikely that there would have been an ignition based on the concentration of fuel vapor that would be needed in the air at the higher altitude.

Pl. Mem. L. pp 6-7.

However, to the extent that Plaintiffs' experts intend to rely entirely on opinions reached by other experts[3] to reach their own opinions, their reliance is misplaced.  While Rule 703 of the Federal Rules of Evidence allows an expert to opine based on hearsay or conclusions gathered through the assistance of other experts, the proffered expert must give his own opinion based upon his own expert analysis.  Simply stated, an expert's opinion must be based upon his own application of principles within his expertise to the facts of the case.  An expert cannot simply parrot the findings of another arrived at in another context.  See Malletier v. Dooney & Bourke, Inc., 525 F. Supp. 2d 558, 664 (S.D.N.Y. 2007)(In rendering an opinion, "the expert witness must in the end be giving his own opinion.  He cannot simply be a conduit for the opinion of an unproduced expert.") (citing Dura Automotive Systems of Indiana, Inc. v. CTS Corporation, 285 F.3d 609, 613 (7th Cir. 2002)); Eberli v. Cirrus Design Corp., 615 F. Supp. 2d 1357 (S.D. Fla. 2009) ("expert must make some findings and not merely regurgitate another expert's opinion"); United States Gypsum Co. v. Lafarge, 670 F. Supp. 2d 748, 758 (N.D. Ill. 2009)(Where expert testimony "is 'just parroting the opinion' of another expert," such testimony must be excluded.).  To allow otherwise would deprive the opposing party of the opportunity to

---

[3]Such as the opinions of representatives of the Consumer Safety and Protection Commission or the experts at BWC's competitor on the feasability of installing flame arrestor technology on hot water heaters in 1999.

cross examine the expert on the basis for the nontestifying expert's opinion.  See

Malletier, 525 F. Supp. 2d at 666 ("It is true that under Rule 703, experts can rely on

hearsay in reaching their own opinions. But a party cannot call an expert simply as a

conduit for introducing hearsay under the guise that the testifying expert used the hearsay

as the basis of his testimony.").

Moreover, Plaintiffs reliance on Seeley v. Hamilton Beach/Proctor-Silex, Inc., 349 F.

Supp. 2d 381 (N.D.N.Y. 2004), for the proposition that a non-design expert could learn

about design enough to give admissible testimony is also misplaced.  In Seeley, the

subject expert had formed an opinion expressed in a report, had conducted a "series of

experiments" and/or "tests that are appropriate to this litigation," and there was evidence

of the defendant manufacturer having had a previous design that did not have the subject

defect.  Seeley, 349 F. Supp. 2d at 385-86.  Plaintiffs experts' reports mention no tests or

experiments on the hot water heater or a prototype here, and, as indicated above,  it does

not it appear that Plaintiffs' experts possess training or experience in the design of hot

water heaters.

### 3.  Conclusion - Design Defect Claim

The design defect claim requires expert testimony as to the feasibility and efficacy

of alternative designs. Soliman, 2011 WL 6945707, at *5.  While an exception to this rule

exists if a reasonable alternative design is both obvious to and understandable by a

layperson, id., all of Plaintiffs' theories for alternative designs do not fit into this exception.

Even the alternative design theory of an 18 inch heigh elevation of the pilot light requires

expert testimony explaining the chemical properties of flammable vapors at different

heights from the floor, and an explanation of the feasability of designing a hot water heater

16

(or elevating it on a stand) so that a unit with an 18 inch elevated pilot light could be installed in a basement.  Moreover, neither of Plaintiffs' experts addressed this alternative design in their expert report.

Plaintiffs' experts are clearly qualified fire cause and origin experts, but Plaintiffs have failed to establish them as  alternative design experts for purposes of the design defect claims in this case.   Without an expert to support their theory, Plaintiffs' design defect claims are dismissed.  See Kass v. W. Bend Co., 2004 WL 2475606 (E.D.N.Y. Nov. 4, 2004) (granting summary judgment as to design defect claim after excluding expert because plaintiff produced no evidence of a feasible, alternative design), aff'd, 158 F. App'x 352, 352–53 (2d Cir. 2005).

### e.    Negligent Post-Manufacture Failure to Retro Fit or Recall

Plaintiffs also assert that BWC was negligent because it failed to retro fit the water heater with an alternative design, or recall the water heater.  However, because  BWC had no duty under New York law to perform a post-sale retrofit or recall of the hot water heater, any claim that  BWC was negligent for failing to retro fit the water heater with an alternative design, or recall the water heater, is dismissed. See Adams v. Genie Indus., Inc., 14 N.Y.3d 535, 544 (2010) ("We have never imposed a post-sale duty to recall or retrofit a product").

### f.    Warning Defect

Under New York law, a plaintiff may prevail on a defective warning claim if the plaintiff can establish that a manufacturer failed to provide adequate warnings regarding the use of a product and that this failure was the proximate cause of his injury. Voss, 59

17

N.Y.2d at 109; see State Farm Fire & Cas. Co. v. Nutone, Inc., 426 Fed. Appx. 8, 9 (2d Cir. 2011)(To prevail on a failure to warn claim, a plaintiff must demonstrate that (1) a manufacturer has a duty to warn (2) against dangers resulting from foreseeable uses about which it knew or should have known, and (3) that failure to do so was the proximate cause of the harm.)(citing Liriano v. Hobart Corp., 92 N.Y.2d 232, 237 (1998)).  "As part of satisfying those elements, a plaintiff is 'required to prove that the product did not contain adequate warnings.'"  Reed v. Pfizer, Inc., --- F. Supp.2d ----, 2012 WL 859729, at *3 (E.D.N.Y. March 14, 2012)(quoting Mulhall v. Hannafin, 45 A.D.3d 55, 841 N.Y.S.2d 282 (1st Dep't 2007)).

The adequacy of the warning is generally a question of fact for the jury to decide, and "is not ordinarily susceptible to the drastic remedy of summary judgment." Urena v. Biro Mfg. Co., 114 F.3d 359, 366 (2d Cir. 1997).  However, "there is no duty to warn of an open and obvious danger of which the product user is actually aware or should be aware as a result of ordinary observation or as a matter of common sense." Feele v. W.W. Grainger, Inc., 302 A.D.2d 971, 972 (4th Dep't 2003)(citing Liriano, 92 N.Y.2d at 241-242; see Lamb v. Kysor Indus. Corp., 759 N.Y.S.2d 266, 268 (4th Dep't 2003)("The open and obvious nature of that risk negates any duty to warn on the part of defendants.")(citations omitted).  A plaintiff has a duty to both discover and avoid the injury in the exercise of reasonable and ordinary care.  See Fane, 927 F.2d at 128.  In this regard, the New York courts hold that if "'a manufacturer's warning would have been superfluous given an injured party's actual knowledge of the specific hazard that caused the injury,' the Court may, as a matter of law, grant summary judgment." Marshall v. Sheldahl, Inc., 150 F. Supp.2d 400, 405 (N.D.N.Y. 2001)(quoting Liriano, 92 N.Y.2d at 241).

Here, the warnings on the hot water heater and in its instructions manual clearly warn of the dangers associated with flammable vapors in the vicinity of the heater. However, there is a question of fact as to whether the warnings sufficiently warned of dangers associated with flammable vapors located in an adjacent room which might travel along the floor and cause a fire when they come in contact with a low positioned pilot light that is not equipped with the flame arrestor.  Further, although there is no post-manufacture duty to retro fit or recall the hot water heater, "the seller of a product who discovers, after the sale, risks that were not known beforehand [has] a duty to warn." Adams v. Genie Industries, Inc., 14 N.Y.3d 535, 544 (2010).  Construing the facts in the light most favorable to Plaintiffs, BWC learned sometime after the sale of the hot water heater to the Quiles that there was a danger from a pilot light without a flame arrestor situated close to the ground if flammable vapors could be in the surrounding area.[4]

Under these circumstances, a question of fact exists as to whether the warnings provided to the Quiles were sufficient.   Expert testimony is not necessarily required to establish a failure to warn claim, see Hunt v. CNH America LLC, 2012 WL 777321, at *22, n. 38 (W.D.N.Y. March 8, 2012), and here Plaintiffs could establish their failure to warn

---

[4]In this regard, Plaintiffs argue:

[F]our years after the Quiles unit was installed, the CPSC amended the ANSI engineering standard to require the use of [flame arrestor] technology to prevent the long known ignition of residential and commercial fires from water heater pilot lights.  BWC complied with this ANSI standard when forced to by 2003  - four years before the Quiles fire occurred.  But BWC failed to warn the Quiles that there was a fix to a known danger in their water heater either by providing a retro fit of a flame arrestor on the Quiles water heater, or providing or recommending they purchase a new safer unit.  BWC further failed to warn the Quiles that any water heater with a pilot light flame should be elevated 18" off the floor when it was installed in a basement near an adjacent garage.

Pl. MOL p. 3-4.

claim even without expert testimony on the issue of adequate alternative warnings. Therefore, the motion on this ground is denied.

## V.     CONCLUSION

For the reasons discussed above, Defendant  Bradford-White Corporation's motion for summary judgment, [Dkt. # 73] is **GRANTED IN PART and DENIED IN PART**.

The motion is granted in that: (a) all manufacturing defect claims against Defendant Bradford-White Corporation are **dismissed**; (b) all design defect claims against Defendant Bradford-White Corporation are **dismissed**; and (c) all claims of negligent failure to retro fit and/or recall the hot water heater against Defendant  Bradford-White Corporation are **dismissed.**  The motion is denied in all other respects.

**IT IS SO ORDERED**

**Dated:** April 18, 2012

Thomas J. McAvoy
Senior, U.S. District Judge

Attachment 1









Attachment 2

